**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| C.S., by her parent, K.S.;<br>M.T., by her parent, N.T.;<br>H.B., by his parent, V.B.;<br>C.I.R., by her parent, C.R.;<br><br>on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>NEW YORK CITY PUBLIC SCHOOLS, and DAVID C. BANKS, as Chancellor of New York City Public Schools,<br><br>       Defendants. | Case No:<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiffs bring this lawsuit to challenge Defendants' systematic failure to provide equal access to education for students with disabilities who are chronically absent or otherwise suffering from school avoidance ("School Avoidance"), in violation of rights guaranteed by the Individuals with Disabilities in Education Act ("IDEA"), the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), the New York State Constitution, and New York City's Human Rights Law ("NYCHRL").

2.      Plaintiffs are among the approximately 200,000 New York City students who are or should be eligible for services, modifications, and accommodations via an Individualized Education Plan ("IEP") or a Section 504 Accommodation Plan ("504 Plan") because they have disabilities that affect access to education.

3.      Plaintiffs are also among the growing number of students whose disabilities cause them to avoid approaching, entering, and/or remaining in school, such that they are deprived of the benefits of public education.

4.      Nationwide, child and youth mental health diagnoses have skyrocketed in recent years, correlating with an increase in the number of students who are absent from school as a result of their disabilities.

5.      In addition to losing crucial instruction time, many students with School Avoidance also lose access to necessary services and accommodations for their disabilities that they would otherwise be receiving in school, such as speech-language therapy, occupational therapy, physical therapy, and counseling.

6.      But a student's School Avoidance does not relieve Defendants of the obligation to provide that student with the free appropriate public education ("FAPE") to which they are entitled by law.

7.       When a student who is in school finds it challenging to enter or remain in their classroom, the school cannot simply ignore the behavior.  Instead, the school is required by law to conduct evaluations to determine whether the student's behavior is related to a disability.

8.      Students who, like Plaintiffs, avoid attending school altogether are entitled to the same assistance. Indeed, these students frequently require even more support than students who have similar challenges inside school buildings.

9.      The New York City Public School ("NYCPS") has no systematic policy or procedures in place to ensure that a student suffering from School Avoidance receive a FAPE.

10.    Although NYCPS's Chancellor's Regulations provide for certain processes to address chronic absenteeism, those processes are rarely followed, and in any event, are wholly insufficient to address School Avoidance.

11.    The only concrete instructions in the Chancellor's Regulations for investigating chronic absenteeism involve reporting allegations of educational neglect to the New York State Office of Child and Family Services Central Registry.  Barring educational neglect, the regulation merely instructs staff to offer parents unspecified resources and interventions.

12.    While NYCPS does instruct its staff to consider conducting a Functional Behavior Assessment ("FBA") to assess "any behavior with an impact on learning, including but not limited to: elopement [leaving class or school] . . . and *school avoidance*,"[1]  NYCPS rarely conducts an FBA for students experiencing School Avoidance.

13.    NYCPS also fails to provide adequate resources or interventions to help students with School Avoidance get back to school.

14.    When parents affirmatively request help returning their disabled children to school, they are often told that schools cannot conduct any evaluations or implement services until the student is regularly attending school in a school building.

15.    In some circumstances schools suggest pursuing Homebound Instruction ("HI"), a short term, home-based program that provides only a limited number of hours of instruction. HI is inadequate as a long term educational solution.

---

[1] *Special Educ. Standard Operating Procs. Manuel*, NYC Dep't of Educ. ("NYCPS SOPM"), https://infohub.nyced.org/docs/default-source/default-document-library/specialeducationstandardoperatingproceduresmanualmarch.pdf?sfvrsn=4cdb05a0_2 (last visited Oct. 7, 2024).

16.    Students receiving HI rarely receive the full complement of supports and services to which they are entitled and which they would typically receive in school, such as speech-language therapy or occupational therapy.

17.    What is more, HI requires a recommendation from a physician or psychiatrist, limiting this option to students with consistent access to healthcare.  But given the severe shortage of psychiatrists needed to treat children and youth—especially for families with limited resources—obtaining that care can be challenging, thus making access to education even more difficult.[2]

18.    Federal, state, and city laws are clear: schools are required to provide services, accommodations, or modifications to students with disabilities and cannot discriminate against them or deny them access on the basis of disability.

19.    Defendants' failure to develop and implement a policy to address School Avoidance is an abrogation of their duty to ensure that students with disabilities receive equal access to education and requires the intervention of this Court.

## JURISDICTION AND VENUE

20.    This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiffs' IDEA, Section 504, ADA, and 42 U.S.C. § 1983 claims are asserted under the laws of the United States.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) because Plaintiffs' claims are asserted under laws providing for the protection of civil rights.  Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201 and 2202.

21.    This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiffs' claims under the New York State Constitution and the NYCHRL.

---

[2]    Mark Moran, *Survey Reveals Stark Difficulty in Obtaining Appointments for Child Psychiatric Care*, Psychiatry News, Vol. 58, No. 8 (July 21, 2023), https://psychiatryonline.org/doi/10.1176/appi.pn.2023.08.8.40.

22.    Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because Defendant NYCPS's principal place of business is in this district, and a substantial part of Defendants' systemic and policy decisions giving rise to Plaintiffs' claims occurred and continue to occur in this district.

## PARTIES

23.    Initials are used throughout this Complaint to preserve the anonymity of the children and their parents, and the confidentiality of their personal information, in conformity with Rule 5.2(a) of the Federal Rules of Civil Procedure, and the privacy provisions of the IDEA, 20 U.S.C. § 1417(c), and of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g.

24.    Plaintiff C.S. is a minor child who is a public school student in New York City. K.S. is the parent of C.S. and brings this lawsuit on behalf of C.S.  The family resides in New York County.  C.S. has struggled with School Avoidance since September 2019.

25.    Plaintiff M.T. is a minor child who is a public school student in New York City. N.T. is the parent of M.T. and brings this lawsuit on behalf of M.T.  The family resides in Queens County.  M.T. has struggled with School Avoidance since November 2023.

26.    Plaintiff H.B. is a minor child who is a public school student in New York City.[3] V.B. is the parent of H.B. and brings this lawsuit on behalf of H.B.  The family resides in Bronx County.  H.B. has struggled with School Avoidance since September 2018.

27.    Plaintiff C.I.R. is a minor child who was a public school student in New York City. C.R. is the parent of C.I.R. and brings this lawsuit on behalf of C.I.R.  The family resides in New York County.  C.I.R. has struggled with School Avoidance since October 2022.

---

[3]    At various points in time, H.B. has gone by the initials E.B., K.B., and R.B.

28.     Defendant NYCPS is an agency of New York City.  NYCPS has control over educational matters affecting students in New York City and is responsible for the general supervision and management of the City's public schools.  NYCPS is responsible for ensuring its schools comply with federal, state, and local laws.

29.     Defendant David C. Banks is the Chancellor of NYCPS.  Defendant Banks is responsible for the day-to-day operations of both NYCPS and all New York City public schools.  Defendant Banks is sued in his official capacity.

## LEGAL FRAMEWORK

30.     Federal, State, and City laws and regulations—including the IDEA, the New York State Education Law, Section 504, the ADA, and the NYCHRL—require NYCPS to provide students with disabilities a FAPE and equal access to an education.

**I.    The Individuals with Disabilities Education Act, New York State Education Law, and Education Department Regulations**

31.     Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A) & (B).

32.     The IDEA offers federal funds to States in exchange for a commitment to furnish a FAPE to all children with certain physical or intellectual disabilities, and tasks local education agencies ("LEA") with ensuring that students with disabilities receive required supports.  20 U.S.C. §§ 1412(a)(1); 1414(d)(2).  NYCPS is the LEA that must ensure compliance with the IDEA in New York City.

33.     Parallel sections of the New York Education Law and of New York State Education Department Regulations similarly guarantee a FAPE to students with disabilities.  N.Y. Educ. Law § 4401; 8 N.Y.C.R.R. §§ 200, 201.

34.     As the IDEA sets forth, a FAPE comprises "special education and related services"—both "instruction" tailored to meet a child's "unique needs" and sufficient "supportive services" to permit the child to benefit from that instruction.  20 U.S.C. § 1401(9), (26), (29); *see also Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203 (1982).

35.     The IDEA requires that "[a]n individualized education program [IEP]", be "developed, reviewed, and revised for each child with a disability."  20 U.S.C. § 1412(a)(4). Indeed, the IEP serves as the "primary vehicle" for providing each child with the promised FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d).

36.     The IDEA also requires that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A). Thus, once the IEP is in place, the LEA must implement the IEP in the least restrictive environment ("LRE").  *Id.*; 34 C.F.R. § 300.114(a)(2)(i); *see also* 8 N.Y.C.R.R. §§ 200.1(cc), 200.6(a)(1).

37.     The IDEA imposes a "Child Find" obligation, which requires LEAs to put policies and procedures in place to identify, locate, and evaluate all disabled students who require special education and related services, regardless of whether they are enrolled at a public or private school. 20 U.S.C. §§ 1412(a)(3)(A), (10)(A)(ii)(I); 34 C.F.R. § 300.131(a).

## II.     <u>Section 504 of the Rehabilitation Act and the Americans with Disabilities Act</u>

38.     Section 504 and the ADA provide additional layers of protection to ensure that public schools do not discriminate against students on the basis of their disabilities.  29 U.S.C. § 794; 42 U.S.C. § 12132 *et seq.*; *see also* 28 C.F.R. § 35.130(b)(1); 34 C.F.R. § 104.4(b)(1).

39.     Section 504 provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

40.     Section 504 applies to any person who "(i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."  34 C.F.R. § 104.3(j)(1).

41.     Similar to the IDEA, Section 504 also requires NYCPS to "provide a free appropriate public education [FAPE] to each qualified handicapped person" in New York City, "regardless of the nature or severity of the person's handicap."  34 C.F.R. § 104.33(a).

42.     Section 504 requires NYCPS to "provide for the education of, each qualified handicapped person in its jurisdiction with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person."  34 C.F.R. § 104.34(a); *see also* 34 C.F.R. § 104.4(b)(2).

43.     Section 504 also requires that NYCPS "conduct an evaluation . . . of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement."  34 C.F.R. § 104.35(a).

44.     Under Section 504, NYCPS must also "provide non-academic and extracurricular services and activities in such manner as is necessary to afford handicapped students an equal opportunity for participation in such services and activities," which "may include counseling services, physical recreational athletics, transportation, health services, [and] recreational activities."  34 C.F.R. § 104.37(a).

45.     Similarly, under Title II of the ADA, NYCPS cannot "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," and NYCPS must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b).

46.     The ADA further requires NYCPS to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

### III.     New York City Human Rights Law

47.     The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person . . . of any place or provider of public accommodation… [b]ecause of any person's actual or perceived . . . disability . . . status, directly or indirectly[,]… [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges…."  N.Y.C. Admin. Code § 8-107(4)(a).

48.     Persons include all "natural persons, proprietorship, partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations [and] legal representatives…."  N.Y.C. Admin. Code § 8-102(2).

49.     Educational institutions, defined as "kindergartens, primary and secondary schools, academies . . . and all other educational facilities," are contemplated within the definition of public accommodations in the NYCHRL.  *Id.*  Public education services constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102(9).

50.     The NYCHRL mandates that covered entities must make "reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question, provided that the disability is known or should have been known by the covered entity."  N.Y.C. Admin. Code § 8-107(15).

## FACTUAL ALLEGATIONS

### I.    School Avoidance Is a Pervasive Problem

51.     Chronic absenteeism, which NYCPS defines as an attendance rate of under 90%,[4] has long been a problem among the schoolchildren of the United States, including in New York City.

52.     That problem has grown even more acute in recent years.  Over the course of the COVID-19 pandemic, the share of chronically absent children nearly doubled.  Over six million more American students were "chronically absent" than had been in the 2018-19 school year.[5]  In the 2022-23 school year alone, approximately one out of every four American schoolchildren missed at least 10% of the school year.[6]

53.     Students with disabilities make up a significant share of America's chronically absent.  Moreover, the rise of depression and anxiety among children after the pandemic has been a major source of the increase in chronic absenteeism.[7]  Children with episodes of anxiety or

---

[4]   NYCPS Chancellor's Regulations A-210 § III(D).

[5]   *See* David Wallce-Wells, *Why Children Are Missing More Sch. Now*, N.Y. Times (June 5, 2024), https://www.nytimes.com/2024/06/05/opinion/covid-school-attendance-pandemic-closings.html.

[6]   Jocelyn Gecker, et al., *Millions of Kids Still Skip Sch. Frequently. Could Recess—and a Little Cash—Help a Lot?*, Chalkbeat (Aug. 15, 2024), https://www.chalkbeat.org/2024/08/15/millions-kids-still-skipping-school-could-the-answer-be-recess-and-cash/.

[7]   Jillian Jorgensen, *For Some Chronically Absent Students, the Problem is Sch. Refusal*, NY1 (Mar. 2, 2023), https://ny1.com/nyc/all-boroughs/education/2023/03/02/for-some-chronically-absent-students--the-problem-is-school-refusal; Amy Zimmer, *"I'm Lucky if I Can Get Him Out of Bed": NYC Families Struggle With School Refusal*, Chalkbeat (May 17, 2022), https://www.chalkbeat.org/newyork/2022/5/17/23099461/school-refusal-nyc-schools-students-anxiety-depression-chronic-absenteeism/.

anxiety disorders find themselves overwhelmed and overstressed by the school environment and cope with their discomfort by avoiding school altogether, resulting in School Avoidance.[8]

54.     Given these trends, it is no surprise that recent statistics reveal that approximately half of students with disabilities in New York City are chronically absent.[9]  In fact, when looking only NYCPS's District 75 schools—the District tasked with providing highly specialized instructional support for students with significant disabilities, like autism spectrum disorders, significant cognitive delays, emotional disabilities, sensory impairments, and multiple disabilities—more than two-thirds of students are chronically absent.[10]

## II.  NYCPS Fails to Offer Sufficient Services, Accommodations, and Modifications to Help Students Get Back in the Classroom, as Necessary to Provide a FAPE

55.     NYCPS has acknowledged both the rise in chronic absenteeism and its own obligations to address the problem.  In the words of NYCPS spokesperson Nicole Brownstein: "It is the work of every educator to improve attendance across our school system and ensure that every single student feels safe, seen, and welcomed every day in their school buildings and communities, and engaged in their classroom learning. ... While absenteeism increased nationally post-pandemic, we are focused on addressing the needs of our students at the school and classroom levels."[11]

---

[8]  Evelyn Berger-Jenkins, *When School Anxiety Becomes Sch. Avoidance*, Columbia Univ. Irving Med. Ctr. (Mar. 27, 2024), https://www.columbiadoctors.org/news/when-school-anxiety-becomes-school-avoidance.

[9]  *See* End-of-Year Attendance & Chronic Absenteeism Data, N.Y.C. Pub. Schs. InfoHub, https://infohub.nyced.org/reports/students-and-schools/school-quality/information-and-data-overview/end-of-year-attendance-and-chronic-absenteeism-data (last visited Oct. 7, 2024); *see also*, Jillian Jorgensen, *For Some Chronically Absent Students, the Problem is Sch. Refusal*, NY1 (Mar. 2, 2023), https://ny1.com/nyc/all-boroughs/education/2023/03/02/for-some-chronically-absent-students--the-problem-is-school-refusal.

[10]  Jillian Jorgensen, *For Some Chronically Absent Students, the Problem is Sch. Refusal*, NY1 (Mar. 2, 2023), https://ny1.com/nyc/all-boroughs/education/2023/03/02/for-some-chronically-absent-students--the-problem-is-school-refusal; *District 75*, N.Y.C. Public Schs., https://www.schools.nyc.gov/learning/special-education/school-settings/district-75 (last visited Oct. 7, 2024).

[11]  Jillian Jorgensen, *For Some Chronically Absent Students, the Problem is Sch. Refusal*, NY1 (Mar. 2, 2023), https://ny1.com/nyc/all-boroughs/education/2023/03/02/for-some-chronically-absent-students--the-problem-is-school-refusal.

56.     Despite its awareness of the issue, however, NYCPS's efforts at finding a solution have fallen woefully short.  NYCPS lacks a policy and program necessary to prevent or address the problem of School Avoidance in a systemic way.

57.     Rather than implement a system-wide policy or program to address this phenomenon, NYCPS typically either: (1) ignores the situation; (2) suggests parents apply for HI; or (3) convinces parents to homeschool their child.

58.     This falls short of NYCPS's obligations under the law.

**A.     NYCPS Ignores School Avoidance or Fails to Offer Meaningful Accommodations to Address It**

59.     NYCPS also has a pattern and practice of failing to help students with School Avoidance return to the classroom as required under federal, state, and local law.

60.     Services and accommodations that help students with School Avoidance return to the classroom include, but are not limited to: behavioral therapy, counseling, transportation to and from school, training for school personnel, and a support team trained in behavioral management.

61.     Rather than provide these or other adequate services, or make reasonable modifications or accommodations to help the child return to school, NYCPS routinely shifts its obligations onto the student's parents instead.

62.     For example, in the case of C.S., a student suffering from School Avoidance, school staff merely advised her mother, K.S., to encourage C.S. to attend, but offered no other strategies or plan for her to return to school.

63.     When M.T. was experiencing School Avoidance, her school's guidance counselor suggested only that M.T.'s parents begin to drive her to and from school each day or that M.T. start attending a different school altogether.  On some days, M.T.'s mother or father, both of whom

had full-time employment in the health care sector until M.T. stopped attending school, remained outside the school for up to two hours.

64.    And in the case of H.B., another student experiencing School Avoidance, school staff's only strategy was to request that his parents pick him up early from school on many days.

65.    In C.I.R's case, school staff did make modest efforts to improve C.I.R.'s attendance, which were limited to offering C.I.R. a small prize to reward attendance and a set of headphones to try to reduce her sensory sensitivities.  Although these measures were well-intended, they fell short of the accommodations and services necessary to successfully reinstate C.I.R.'s attendance in school.

66.    Further, when parents of students experiencing School Avoidance ask for help in the form of new evaluations and additional services, they are often told by NYCPS staff that evaluations cannot be conducted because the student is not in school.  Such a response not only denies services to those who may need it most, but also plainly violates the IDEA, which contemplates the provision of special education in the home.

**B.    NYCPS Often Suggests that Children with School Avoidance Enroll in Home Instruction**

67.    HI is a short-term service that provides a limited number of hours of instruction in students' homes for students who cannot attend school for at least ten days in a three-month period due to physical or psychiatric disorders.  8 N.Y.C.R.R. § 100.22.  To qualify for HI, a student must receive a recommendation from a physician or psychiatrist.  That recommendation is also subject to approval by a reviewing physician from NYCPS or the Department of Health.

68.    While receiving HI, students remain "affiliated" with a NYCPS school for purposes of curriculum, grades, and credit awards, and are expected to return there after their conditions improve.

69.     HI teachers must hold teaching certifications, but they are not required to hold special education licenses.

70.     HI students are supposed to receive a minimum of 10 hours per week on the elementary level and 15 hours per week on secondary level.  8 N.Y.C.R.R. § 100.22(e)(2).

71.     However, on information and belief, NYCPS routinely fails to provide HI students with the minimum hours of instruction they are supposed to receive.

72.     Moreover, the minimum hours students are supposed to receive with HI are far less than students would receive if they were attending school and are insufficient to guarantee students with disabilities equal access to a FAPE.

73.     HI is meant to be a short-term solution and is ordinarily granted for a limited period of time.  To extend that period, a student must submit a renewed application and undergo the same approval process.

74.     As a long-term program, HI does not comply with the requirements of the IDEA, Section 504, the ADA, or New York State law.

75.     When students receive HI, they typically do not receive the supports, services, and accommodations to which they are entitled to under law, often because schools fail to provide parents with the appropriate authorization forms.  M.T., for instance, has been receiving one and a half hours of HI per day since March 2024, but N.T. never received any authorization forms.  As a result, she has not received any of the related services listed on her IEP during this time.

C.     **NYCPS Offloads Its Responsibility for Educating Students with School Avoidance by Recommending Homeschooling**

76.     NYCPS has also in some instances abdicated its responsibility to educate students with School Avoidance by recommending to their families that the students instead be homeschooled.

14

77.     In the case of C.I.R., C.I.R.'s poor attendance prompted school staff to insist that C.I.R. be homeschooled.   School staff never advised C.I.R.'s parents that any other options, including HI, were available for C.I.R.   Only after C.I.R.'s mother followed the strong direction of school staff, and elected to homeschool C.I.R., did she find out about HI as a potential option. But school staff informed her that C.I.R. was now ineligible for HI as a homeschooled student.

78.     As with HI, homeschooled students like C.I.R. do not receive any of the supports, services, or accommodations to which they are entitled under law.

### III.   NYCPS Fails to Properly Identify or Evaluate Students Struggling With School Avoidance

79.     NYCPS has also failed its legal obligation to put in place a system capable of effectively identifying and evaluating students experiencing School Avoidance.

#### A.     NYCPS Fails to Identify Students with School Avoidance

80.     Although NYCPS has a policy in place to identify chronically absent students, its policy is inadequate because, among other things: (1) it is enforced inconsistently across schools; (2) it falls short of identifying students whose chronic absenteeism is caused by a disability; and (3) not all students with School Avoidance are "chronically absent."

81.     As set forth in NYCPS Chancellor's Regulation A-210, individual NYCPS schools and their principals are required to track school attendance.   Students are marked present so long as they attend one instructional period of the day, even if they arrive late or leave early. Attendance staff must contact parents on the first day of a student's absence to ascertain whether it is excused due to, e.g., illness. When a student is absent for 10 consecutive days, and if a pre-k through 8th grade student has been absent for 20 days in a four month period,[12] the school is obliged to ascertain the reasons through parent outreach.   All contacts with families must be entered into

---

[12]   The Regulation also has a separate count of days for student absences when a prior 407 investigation has occurred.

NYCPS's iLog student tracking system.  If the reason(s) for the chronic absence cannot be obtained, NYCPS's student tracking system automatically triggers a "407 Investigation."  *See* NYCPS Chancellor's Regulations A-210.

82.    To complete a 407 Investigation, school staff must make and maintain contact with the student's parents and offer resources and interventions until the attendance issue is "resolved." A 407 Investigation is resolved when one of the following five outcomes is reached: (1) a State Central Registry ("SCR") complaint is filed; (2) the student returns to school; (3) the student is discharged if the family cannot be located; (4) the student ages out of compulsory school age requirements; or (5) the student is flagged with "non-attending" reason, which is used for students who cannot be discharged and cannot return to regular attendance.

83.    But the application of required attendance investigation actions is not just notoriously inconsistent across schools but systemically deficient.  In fact, a 2018 audit of NYCPS's efforts to monitor and address school attendance concluded that NYCPS "does not engage in adequate outreach or have sufficient oversight of efforts made to track and monitor the attendance of students."[13]  Six years later, the problems identified by the Office of the Comptroller persist.

84.    Further, the issue is not merely one of inadequate effort but also structural shortcomings.  Among those shortcomings is the fact that the current process for 407 Investigations does not even include a process to identify students specifically struggling with School Avoidance.

85.    Moreover, if no SCR complaint is filed, NYCPS often takes no additional actions to identify the reasons that the student is not attending or the causes of the student's absenteeism.

---

[13] *Audit Report on the Dep't of Educ.'s Efforts to Monitor & Address Sch. Attendance of Homeless Children Residing in Shelters*, Off. of the Comptroller (March 12, 2018), https://comptroller.nyc.gov/wp-content/uploads/documents/MG16_098A.pdf.

B.    **NYCPS Fails to Evaluate Students with School Avoidance**

86.    NYCPS also falls short in its obligation to evaluate students experiencing School Avoidance.

87.    NYCPS does not have a procedure to adequately evaluate students experiencing School Avoidance.

88.    NYCPS's procedures only require it to "consider" conducting an FBA when students with disabilities "exhibit[] behaviors that impede his/her learning or that of others."[14]

89.    An FBA includes a review of a student's records, conversations with teachers and family members, and staff observations of the student in various settings to gather "ABC" data that describes the *antecedent* (triggers) for the behavior, what the *behavior* itself entails, and the *consequences* of the behavior.  Those data inform a written Behavior Intervention Plan ("BIP") that specifies the actions school staff must take to improve the behavior.[15]

90.    FBAs and BIPs are an essential part of evaluating students for special education eligibility and developing individualized services.[16]

91.    NYCPS specifically instructs its staff to consider an FBA to assess "any behavior with an impact on learning, including but not limited to: [e]lopement [leaving class or school,] [b]ehaviors injurious to self or others[, and] **[s]chool *avoidance***."[17]

92.    Despite this explicit instruction, however, NYCPS regularly fails to comply with this obligation for students whose disabilities prevent them from entering the schoolhouse doors,

---

[14]   NYCPS SOPM at 26-27.
[15]   *Id.*
[16]   *Id.*
[17]   *Id.* at 27 (emphasis added).

refusing to evaluate students at home.  Indeed, parents are often told that these evaluations will only be conducted after the student is "better" and returns to school.

93.    The lack of evaluations makes it impossible to determine what services and accommodations would be most effective in helping the student return to school, as required to provide each student with a FAPE, and is a plain violation of NYCPS's obligations under the law.

## IV.    Individual Plaintiffs

### Plaintiff C.S.

94.    C.S. is 16 years old, lives in Manhattan, and is in eleventh grade.  C.S. has an educational classification of Other Health Impairment ("OHI") and has received diagnoses of agoraphobia, Major Depressive Disorder ("MDD"), and Social Anxiety Disorder ("SAD").  C.S. is currently enrolled in A Schools Without Walls ("SWW"), a NYCPS high school that offers hybrid in-person and remote instruction.  The remote instruction component is designed to follow up on instruction received while in-person.  C.S.'s most recent IEP reports that C.S. "has struggled to maintain attendance with consistency due to feelings of social anxiety and fear of social judgment."

95.    C.S. has avoided attending school since September 2019, when she was a sixth-grade student.  After receiving remote instruction in the latter part of the 2019-2020 school year due to the COVID-19 pandemic, C.S. began HI in August 2020.

96.    From June 2021 through December 2021, C.S. attended the Harmony Heights Day School, a New York State Approved Nonpublic School ("NPS") in East Norwich, New York, and Ziccolella Middle School, part of Greenburgh Graham Union Free School District in Hastings-on-

Hudson, New York, also an NPS.[18]  After struggling with attendance at both schools, she returned to HI.

97.    In July 2022, C.S. was placed at a third NPS, The Karafin School, located in Mount Kisco, New York.

98.    To attend The Karafin School, C.S needed to ride a bus for over an hour each way. Due to the length of the bus ride C.S. did not feel comfortable at The Karafin School, C.S. eventually refused to take the bus to The Karafin School.

99.    In November 2022, C.S. enrolled in SWW.  K.S. believed that the hybrid program at SWW would be a good fit for C.S.'s needs and make it easier for her to attend school.

100.    At first, C.S. attended SWW on both in-person and remote days.  Within a few weeks, however, C.S. began to suffer from severe panic attacks at school.  She also experienced sensory overload while attending in person.  As a result, C.S. ceased attending the in-person component of SWW's curriculum.  Because she could not participate effectively in SWW's remote component if she had not also attended in-person, C.S. struggled to keep pace with her coursework and soon avoided logging in for remote instruction.

101.    K.S. reached out to numerous staff members at SWW to discuss ways to improve C.S.'s attendance, including the special education teacher and the guidance counselor.  She copied the school's principal on all email communication with staff. While SWW staff suggested that her mother, K.S., encourage C.S. to attend in-person and/or log in to remote instruction, they neither undertook an FBA nor offered any strategies that K.S. could implement to help C.S. return to school.  Moreover, although C.S.'s most recent IEP suggests that certain SWW staff members

---

[18]  In New York State, an NPS is within the continuum of placement options for special education.

would "collaborate" with C.S. "on a reengagement plan," no outreach to collaborate has taken place and no such plan has been created.

102.    SWW staff further directed K.S. to seek outside therapy for C.S.  K.S. accordingly located a private psychiatric specialist to conduct an evaluation of C.S.  Based on that evaluation, C.S. received diagnoses of MDD and SAD.  K.S. informed SWW of these diagnoses and requested an independent neuropsychological evaluation.  SWW denied that request in December 2023.

103.    After receiving HI from May through August 2024, C.S. is currently attending only the remote days at SWW, three days per week. While she consistently logs into the morning classes, she often logs off for the afternoon.  She is not currently receiving either the group or individual counseling services mandated by her IEP.

**Plaintiff M.T.**

104.    M.T. is 15 years old, lives in Queens, and is in ninth grade.  M.T. has an educational classification of Autism Spectrum Disorder ("ASD") and has been diagnosed with ASD and Intermittent Explosive Disorder.  As a result of her disabilities, M.T. finds it hard to remain still and she has a tendency to elope.  M.T. has had at least eight emergency room visits and two psychiatric hospitalizations within the past two years and she receives assistance from an in-home aide provided by the New York State Office for People with Developmental Disabilities ("OPWDD").  M.T. is currently enrolled on an interim basis at Queens Transition Center ("Q752").  M.T.'s most recent IEP calls for her to receive speech therapy and occupational therapy services.  M.T. currently receives HI.

105.    M.T. first struggled with school attendance while attending middle school at The Robert E. Peary School ("P.75Q").

106.    In 2022, M.T.'s IEP team recommended that M.T. receive a residential placement at an NPS to address her needs.  In over two years, NYPCS has never secured a residential placement for her.

107.    M.T. later transferred to The Walter Reed School I.S. 009 ("I.S. 009") in Queens, where she attended classes regularly and thrived academically.

108.    After graduating from I.S. 009 in June 2023, M.T. began attending Q752 in the fall of 2023.  There, M.T. was frequently teased by other students for her pacing and elopement.

109.    M.T. began avoiding school in October 2023 by refusing to take the bus.

110.    Based on conversations with Q752's guidance counselor concerning M.T.'s difficulties with attendance, M.T.'s parents began to drive M.T. directly to and from school each day.

111.    The Q752 guidance counselor also suggested transferring M.T. to a school in Brooklyn, an option that was unworkable for her family.

112.    M.T. continued to have trouble with attendance even after her parents began driving her to school.  Her parents would often drive M.T. to the school building and then, after failing to persuade her to leave the car and enter the school, bring her back home.  On some days, M.T.'s mother or father remained outside the school for up to two hours, pleading unsuccessfully with M.T. to go into the school.  By November 2023, M.T. stopped attending school altogether.

113.    That same month, in light of M.T.'s difficulty attending school, and the absence of any effective strategies provided by the school to address it, M.T.'s mother, N.T., inquired with staff at Q752 about the possibility of setting up HI as a temporary alternative to in-person attendance.  The school agreed to assess whether M.T. could receive HI.

114.    Until HI was set up months later in March 2024, M.T. received no instruction of any kind.  No FBA was conducted and M.T.'s family also had no contact with Q752 during that time, aside from a single meeting in January 2024 to discuss the potential implementation of HI. Q752 staff did not discuss any strategies during that meeting to assist M.T. with returning to attend school.

115.    M.T. received one and a half hours of HI per day from March 2024 through August 13, 2024, the last day of the summer session. N.T. immediately reapplied for HI for M.T. but instruction did not begin until September 30, 2024 – more than three weeks after the start of the school year.  She is not currently receiving the speech therapy and occupational therapy services required by her IEP.

**Plaintiff H.B.**

116.    H.B. is 16 years old, lives in the Bronx, and is in tenth grade.  H.B. has been diagnosed with ASD, depression, and Attention Deficit/Hyperactivity Disorder ("ADHD").  H.B. also appears to suffer from agoraphobia.  H.B. has had three inpatient hospitalizations for depression.  H.B.'s most recent IEP indicates that his reading and math skills are at a twelfth-grade level.  H.B. is currently enrolled at Virtual Innovators Academy ("VIA"), a fully remote public high school headquartered in the Bronx.  He has been attending a minimal number of classes.

117.    V.B. first referred H.B. for a special education evaluation when he was in third grade due to concerns about his social-emotional functioning in school.  After an evaluation, H.B. was found ineligible for services.

118.    H.B. has struggled with school attendance since the fall of 2018, when enrolled in Jonas Bronck Academy ("JBA") in the Bronx.  H.B.'s struggles began after JBA staff had arranged for H.B. to go to the psychiatric emergency department one day in October 2018 after H.B. had an emotional breakdown.  Subsequently, on those days that H.B. agreed to go to school he

nevertheless insisted on staying in the JBA guidance counselor's office rather than attending his classes.

119.    JBA staff responded to H.B.'s refusal to attend classes by letting him stay in the guidance counselor's office or by suggesting that he take a walk.  On many days, they simply requested that V.B. pick him up from school and take him home.

120.    In January 2019, V.B. once again requested a special education evaluation because H.B.'s anxiety interfered with his school attendance.  Yet JBA staff delayed conducting that evaluation for nearly a year.  When V.B. inquired why it was taking so long, JBA staff told her that they would not evaluate H.B. because he was not attending school.  H.B. was hospitalized on three separate occasions that year for depression.

121.    When an IEP meeting finally took place in December 2019, the team recommended that H.B. receive an NPS placement.  The team further determined that H.B. would receive HI until a placement was secured.  Although H.B.'s IEP acknowledged his attendance struggles, no plan to address the root causes of his poor attendance was put in place.

122.    H.B. did not begin receiving HI until months later, in March 2020.  V.B. continued to seek the NPS placement called for by H.B.'s IEP without any assistance from NYCPS.  She ultimately succeeded in securing a placement at Green Chimneys, a school that incorporates animal-assisted therapy into its instruction for children with special needs.  Green Chimneys has two campuses, one in Carmel, New York, and the other in Brewster, New York.  H.B. began attending the Carmel campus in February 2021—over a year after he was initially recommended an NPS placement.

123.    By the fall of 2021, H.B.'s attendance at Green Chimneys began to wane and he stopped attending altogether in November of that year.  Upon noticing H.B.'s declining attendance,

a social worker at Green Chimneys recommended that H.B. be transferred to the Brewster campus, Green Chimneys' second campus located in Brewster, NY.  But the Brewster campus denied that recommendation, citing H.B.'s chronic absences.  Green Chimneys also denied V.B.'s request that H.B. receive virtual instruction.

124.    Because H.B. was not attending school, Green Chimneys made an educational neglect report to the SCR that ultimately was not substantiated.  H.B. lost his placement at Green Chimneys entirely at the end of the 2021-2022 school year.

125.    H.B. went without a school placement for the entire 2022-2023 school year.

126.    NYCPS declined to help V.B. find a new placement for H.B.  Although she personally submitted several applications on H.B.'s behalf, all were rejected.  H.B.'s IEP eventually changed the NPS recommendation to a public school setting.  V.B. and H.B. decided that the fully remote program at VIA would be a good fit for H.B.'s needs.

127.    With the assistance of an educational advocate, V.B. and H.B. discovered VIA, which is a fully remote high school. H.B. applied and was accepted.

128.    In November 2023, H.B. enrolled in VIA, where he continued to struggle with attendance.  In the 2023-2024 school year, H.B. typically logged on for the first class of each day to be marked as present before then logging off for the rest of the day.  Since H.B. was first enrolled in VIA, VIA has not conducted an FBA or developed a plan to help H.B. attend school regularly.

129.    In late September 2024, H.B. and V.B. met with school staff to discuss H.B.'s continuing poor attendance.  A teacher indicated that if H.B. communicated with him at any point during the first period of the day, H.B. would be marked present.

**Plaintiff C.I.R.**

130.    C.I.R. is 10 years old, lives in Manhattan, and is in fifth grade.  C.I.R. has been diagnosed with ASD and SAD.  C.I.R. receives respite care, comprised of twelve hours of in-home

and four hours of community habilitation care each week, through OPWDD. C.I.R. also receives physical, occupational, and speech-language therapies at home through Medicaid. Her most recent IEP recommended placement in a community school self-contained classroom with twelve students, one special education teacher, and one paraprofessional ("12:1:1") with counseling and speech/occupational therapy services. C.I.R. is currently being homeschooled.

131.    C.I.R. began refusing to attend school in October 2021, while she was enrolled at James Weldon Johnson Leadership Academy P.S. 57 ("P.S. 57"). C.I.R. said that the reason she did not want to attend was because she was afraid of her teacher. Even when she did attend school, C.I.R.'s anxiety caused her to routinely arrive late, and she would refuse to stay in class if her mother or father did not stay there with her.

132.    Staff at P.S. 57's modest efforts to improve C.I.R.'s attendance were of no avail. Those efforts were limited to offering C.I.R. a small prize to reward attendance and a set of headphones to try to reduce her sensory sensitivities. Although these measures brought about slight improvements in attendance, C.I.R. continued to consistently avoid attending school.

133.    Rather than offer additional assistance, P.S. 57 staff threatened to file a report with the SCR. The school's principal intervened before any report was filed.

134.    In January 2022, C.I.R. transferred to the Jacques Cartier School P.S. 102 ("P.S. 102"). Despite the transfer, and the assignment of a new teacher, C.I.R. continued to avoid school.

135.    C.I.R.'s poor attendance continued for two to three weeks. Rather than conduct an FBA or other accommodations to help C.I.R. return to school, staff at P.S. 102 insisted that C.I.R. be homeschooled instead. Staff at P.S. 102 never advised C.R. that any other options, including HI, were available for C.I.R.

136.    At P.S. 102's direction, C.I.R.'s mother, C.R., elected to homeschool C.I.R. and withdrew her from P.S. 102.  When C.R later inquired whether C.I.R. might receive HI as an alternative to homeschooling, staff at P.S. 102 informed her that C.I.R. was now ineligible for HI as a homeschooled student.

137.    A psychoeducational evaluation conducted in August 2023 indicated that C.I.R.'s cognitive profile is consistent with ASD.  The evaluation did not identify any accompanying behavior issues.

138.    C.I.R. has an Individualized Education Service Plan ("IESP"), the homeschool equivalent of an IEP.  Although she is entitled to speech, occupational, and physical therapy twice per week and counseling once per week, C.R. never received authorization forms to secure services through NYCPS.

139.    C.R. wants her daughter to return to public school, but she believes that without effective strategies from NYCPS to assist with the transition, C.I.R. will not enter a school building.

## CLASS ALLEGATIONS

140.    Plaintiffs bring this action individually and on behalf of all persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2).  Defendants have acted, or refused to act, on grounds generally applicable to the named Plaintiffs and Class members, making relief appropriate and able to be granted to the class as a whole.

141.    The proposed class is defined as (i) all students with disabilities who are eligible to attend New York City public schools and who avoid attending school because of their disabilities, and (ii) students who will, in the future, meet the criteria of (i).

142.    The proposed class is so numerous as to render joinder impracticable.  In the 2022-2023 school year, **nearly half** of NYCPS students with disabilities in New York City were chronically absent.[19]

143.    Although data for 2023-24 is not yet publicly available, upon information and belief, the potential number of class members is at a minimum in the thousands.

144.    Proceeding as a class is superior to having tens of thousands of individual class members litigate their rights separately, particularly given the need for a systemic solution to NYCPS's violations of law cited herein.

145.    Plaintiffs' claims present common questions of law and fact.  All members of the class have been harmed by NYCPS's failure to adopt a policy to address School Avoidance for students with disabilities.  All members of the class have also suffered a common injury as a result—the inability to attend classes and receive related services on a consistent basis, resulting in a denial of a FAPE and a denial of their rights under state and federal law.

146.    Plaintiffs have the same interests as the other class members in prosecuting claims against the Defendants.  Their claims arise from the same conduct—NYCPS's failure to adopt a policy to address School Avoidance—that gives rise to claims of other class members.  Plaintiffs' claims are also based on the same legal theory as the rest of the class—that the lack of such a policy results in a denial of a FAPE and a denial of their rights under state and federal law.

147.    The named Plaintiffs will adequately represent and protect the interests of the Class, and Plaintiffs know of no conflict of interest among the Class members.

---

[19]  Specifically, according to NYC Open Data, 87,674 students with disabilities (46.1%) were chronically absent in the 2022-2023 school year—not including students in preschool, charter schools, home schooling, and home and hospital instruction.  *See* End-of-Year Attendance and Chronic Absenteeism Data, N.Y.C. Pub. Schs. InforHub, https://infohub.nyced.org/reports/students-and-schools/school-quality/information-and-data-overview/end-of-year-attendance-and-chronic-absenteeism-data (last visited Oct. 7, 2024).

148.    Because Defendants have refused to act on grounds that apply generally to the class, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CAUSES OF ACTION

### Count I:  Violation of Individuals with Disabilities Education Act

149.    Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

150.    As the local education agency, NYCPS is legally responsible for complying with the IDEA within New York City.

151.    Defendants have violated the IDEA by failing to adopt and promulgate policies or procedures to address absences for students who experience School Avoidance, thereby denying a FAPE to all members of the class.

152.    Specifically, the Defendants have failed to meet their obligations under the IDEA and state and local implementing regulations through their:

a.    Failure to identify students who experience School Avoidance;

b.    Failure to evaluate students who experience School Avoidance;

c.    Failure to develop appropriate programming for students who experience School Avoidance, including programming in the least restrictive environment; and

d.    Failure to ensure that each student experiencing School Avoidance receives an education that is reasonably calculated to ensure his or her educational progress, including by failing to develop individualized special education programs to address the root causes of their School Avoidance.

## Count II:  Violation of the Americans with Disabilities Act

153.    Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

154.    NYCPS was, at all times relevant to this action, and currently is a "public entity" within the meaning of Title II of the ADA.

155.    NYCPS provided, at all times relevant to this action, and currently provides, "services, programs and activities" including educational programs, services, and activities in their schools.

156.    Plaintiffs and class members were, at all times relevant to this action, and currently are "qualified individuals with disabilities" within the meaning of the ADA.  They all have impairments that substantially limit a major life activity and are qualified—with or without reasonable modifications—to participate in NYCPS's educational programming and services. 42 U.S.C. §§ 12102(2); 12131(2).

157.    By failing to provide appropriate accommodations or modifications to students experiencing School Avoidance, Defendants have failed to provide Plaintiffs and class members equal access to their programs and services, in violation of Title II of the ADA and its implementing regulations.  42 U.S.C. § 12134; 28 C.F.R. § 35.1010.

158.    By failing to ensure that students experiencing School Avoidance receive a FAPE, the educational services NYCPS offers are not equal to, or as effective in affording equal opportunity as, the educational services NYCPS provides to nondisabled students, in violation of 28 C.F.R. § 35.130(b)(1)(ii), among other provisions of the ADA.

159.    By failing to provide Plaintiffs and class members with educational services that are as effective as those educational services available to their nondisabled peers, Defendants deny

those students an equal opportunity to obtain the same result, gain the same benefit, and reach the same level of achievement as their nondisabled peers. Defendants' failure to ensure that students who experience School Avoidance are not discriminated against on the basis of their disability does not constitute equal access to Defendants' education programs and services. As such, the lack of educational services offered to those students is not sufficient to provide equal access to NYCPS's education programs and services to Plaintiffs and class members, in violation of 28 C.F.R. § 35.120(b)(1)(iii), among other provisions of the ADA.

160.    By failing to make reasonable modifications to NYCPS's policies, practices, and procedures governing students who experience School Avoidance to ensure those students have equal access to education, even though these modifications are necessary to avoid discriminating against Plaintiffs and class members, Defendants have violated 28 C.F.R. § 35.130(b)(7).

161.    By failing to adopt the policies or procedures described above, Defendants tend to screen out students with School Avoidance who need educational programming and services, instead of screening them in. This dereliction of duty violates, among other provisions, 28 C.F.R. § 35.130(b)(8).

162.    Defendants use methods of administration that have the effect of subjecting Plaintiffs and class members to discrimination by reason of their disability. As such, these methods of administration also have the purpose and effect of defeating or substantially impairing accomplishment of the objectives of NYCPS's educational programming with respect to Plaintiffs and class members. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(3)(i) and (ii).

### Count III:  Violation of Section 504 of the Rehabilitation Act of 1973

163.    Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

164.    NYCPS was, at all times relevant to this action, and currently is a recipient of federal financial assistance within the meaning of Section 504.

165.    The educational programs and activities provided by NYCPS constitute programs or activities within the meaning of Section 504.  29 U.S.C. § 794(b).

166.    As an entity subject to Section 504, NYCPS must provide qualified students with disabilities an equal opportunity to participate in, or benefit from, any aid, benefit, or service they make available.  34 C.F.R. § 104.4(b)(1)(ii).

167.    Section 504 also requires NYCPS to provide a FAPE to students with disabilities. 34 C.F.R. § 104.33.

168.    Plaintiffs and class members were, at all times relevant to this action, and currently are "qualified individuals with disabilities" within the meaning of Section 504.  They all have impairments that substantially limit a major life activity and are qualified—with or without reasonable modifications—to participate in NYCPS's educational programming and services.

169.    Defendants have discriminated, and are discriminating, against Plaintiffs and class members based on their disabilities by failing to adopt policies and procedures that address School Avoidance.

170.    By denying students experiencing School Avoidance a FAPE, NYCPS's programming and services unequivocally are not equal to or as effective in affording equal opportunity as those offered to nondisabled students, in violation of 34 C.F.R. § 104.4(b)(1)(ii).

171.    By failing to provide Plaintiffs and class members with educational services that are as effective as those educational services available to their nondisabled peers, Defendants deny those students an equal opportunity to obtain the same result, gain the same benefit, and reach the same level of achievement as their nondisabled peers, in violation of 34 C.F.R. § 104.4(b)(1)(iii).

172.    By failing to make reasonable modifications to NYCPS's policies, practices, and procedures to ensure students experiencing School Avoidance have equal access to education, even though these modifications are necessary to avoid discriminating against Plaintiffs and class members, Defendants have violated Section 504.

173.    By denying Plaintiffs and class members access to services addressing their School Avoidance, the Defendants have discriminated, and are discriminating, against Plaintiffs and class members based on their disabilities pursuant to Section 504.

## Count IV:  Violation of the New York City Human Rights Law

174.    Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

175.    Educational institutions are places of public accommodation within the meaning of the NYCHRL.

176.    Defendants, in their role as NYCPS system's managers, violate § 8-107(4)(a) by denying a FAPE to Plaintiffs and class members.

177.    Defendants have refused, withheld from, and denied students experiencing School Avoidance of the accommodations, advantages, facilities, and privileges of attending educational institutions.

178.    Defendants have failed to make reasonable accommodations for Plaintiffs and class members to allow them to enjoy their right to access school and receive an education, despite knowing that these students have disabilities, in violation of N.Y.C. Admin. Code § 8-107(15).

179.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs and class members have been injured as set forth herein.

**Count V:  Violation of the New York State Constitution**

180.    Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

181.    The Education Article of the New York State Constitution mandates that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."  N.Y. Const. art. XI, § 1.

182.    Defendants have failed to provide a sound basic education to Plaintiffs and class members because they have failed to ensure that those students attend school and receive appropriate educations, thereby violating their constitutional guarantees under the Education Article of the New York State Constitution.

183.    Plaintiffs and class members have been irreparably injured as a proximate result of Defendants' ongoing violation of the Education Article.

**Count VI:  Violation of 42 U.S.C. § 1983**

184.    Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

185.    By facts alleged herein concerning Defendants' actions, Defendants have violated 42 U.S.C. §1983 ("Section 1983") by depriving all Plaintiffs and class members, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

186.    By implementing, promulgating, and continuing to enforce and/or effectuate the policies, practices, and customs as alleged herein, Defendants have denied Plaintiffs and class members of educational programs and services to which they are entitled under the IDEA and Section 504, in violation of Section 1983.

187.    Plaintiffs' rights under the IDEA and Section 504 are enforceable under Section 1983, and the Defendants have acted under color of state law.

188.    By failing to adopt adequate policies and procedures to prevent Plaintiffs and class members from being illegally denied the programs and services to which they are entitled, Defendants have violated Section 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray to this Court for an Order:

(i)     Certifying this case as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2);

(ii)    Declaring that NYCPS's policies, customs, patterns, and practices concerning School Avoidance, or lack thereof, violate the IDEA, the ADA, Section 504, the NYCHRL, the New York State Constitution, and Section 1983;

(iii)   Issuing a preliminary injunction ordering Defendants to immediately cease their violations of, and directing them to comply with, the IDEA and its implementing regulations, the ADA, Section 504, the NYCHRL, the New York State Constitution, and Section 1983, and ordering Defendants to identify all class members;

(iv)    Entering Judgment requiring Defendants to submit to the Court a comprehensive plan for a program designed to identify NYCPS students

34

experiencing School Avoidance, and to remediate such School Avoidance, with the goal of those students returning to school;

(v)     Awarding Plaintiffs' attorneys' fees, costs, and expenses, as provided by statute and law; and

(vi)    Granting such other relief as the Court deems just and appropriate.


Dated: October 8, 2024
New York, New York

Respectfully submitted,

**THE LEGAL AID SOCIETY**
Twyla Carter, Attorney-in-Chief

By:  */s/ Susan J. Horwitz*
Susan J. Horwitz, Supervising Attorney, Education Law Project
Adriene Holder, Attorney-in-Chief, Civil Practice
Lilia Toson, Attorney-in-Charge, Civil Citywide Units
Katherine M. Groot, Staff Attorney
49 Thomas Street
New York, NY 10013
(212) 577-3300
shorwitz@legal-aid.org
kgroot@legal-aid.org



**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:  */s/ Jeffrey P. Metzler*
Jeffrey P. Metzler
Spencer E. Young
31 West 52nd Street
New York, NY 10019-6131
(212) 858-1000
jeffrey.metzler@pillsburylaw.com
spencer.young@pillsburylaw.com

*Attorneys for Plaintiffs*